IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GLEN MICHAEL BAUMANN,

                Plaintiff,                           OPINION AND ORDER

v.

                                                         20-cv-11-wmc

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

      Plaintiff Glen Michael Baumann seeks judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits, principally arguing that the ALJ's findings regarding his ability to maintain concentration, persistence, and pace ("CPP") are erroneous. In addition, Baumann argues that the ALJ improperly assessed his credibility.[1] In response, the Commissioner contends generally that the ALJ's recommended disposition of his claim is supported by substantial evidence and should be upheld. The court held oral argument on October 22, 2020, and requested supplemental briefing on the relevance of and deference due the guidance in the Program Operations Manual System ("POMS") for a narrative translation of Section I findings in Section III of the Mental Residual Functional Capacity Assessment ("MRFC"). Having considered the arguments made by the parties during argument and in their briefing, the court finds that the ALJ did not err in denying Baumann's claim. Accordingly, it will

---

[1] Perhaps in recognition of their weakness, plaintiff actually grouped three arguments under an umbrella section in his brief, apparently suggesting that, whether any one is grounds for reversal on its own, in combination the following errors justify reversal: (1) the ALJ improperly considered his past, part-time work performed with accommodations; (2) the ALJ impermissibly considered his daily activities; and (3) the ALJ did not properly take into account his reports of pain.

uphold the Commissioner's decision.

## BACKGROUND

### A. Work History

On August 31, 2016, plaintiff Glen Michael Baumann filed an application for a period of disability and disability insurance benefits, alleging an onset date of July 17, 2015, claiming that he suffered from a variety of impairments which rendered him disabled and unable to work. (AR 28.) While Baumann engaged in some work after his alleged onset date, it was all on a part-time basis. (AR 216-31.) Of particular relevance to this appeal, Baumann worked as a service advisor and salesperson for a Harley-Davidson dealer in 2018. (AR 365.) Starting out in this position on a part-time basis, Baumann apparently tried to return to full-time activity, but testified that he was unable to do so. (AR 365.) Baumann further testified that his employer allowed him a number of additional accommodations, including sitting when he needed, taking extra breaks and days off, adjusting hours to accommodate his pain, coming in later or leaving earlier, and changing days of the week he worked. (AR 365.)

### B. Medical Records

As for physical impairments, Baumann has a long history of musculoskeletal problems for which he received multiple surgeries. (*See* AR 31, 398, 406, 408.) Among his numerous shoulder, back, and knee problems, the medical record shows that Baumann experienced dislocation, arthritis, pain, and tendon tears. (*See generally* AR Exhibits 2F-17F.)

As for Baumann's mental impairments, the record generally indicates normal mental capacity, but still contains evidence of some limitations in broad areas of functioning, including the ability to maintain CPP. In a telephone interview on October 26, 2016, however, the Social Security Administration interviewer noted no difficulty in understanding or concentrating, and observed that he was "[a]ble to answer questions & give information without assistance." (AR 248.) Nevertheless, in his subsequent November 2016 written function report, Baumann reported trouble concentrating and estimated that he could only maintain attention for about five to ten minutes before his mind started to wander, while still indicating that he could operate a vehicle, lawnmower, and washing machine/dryer without difficulty, and he could pay bills, count change, and handle a savings account. (AR 259-64.) Even after his alleged onset date, Baumann worked an accommodated position as a counter clerk/cashier. (AR 36.) Although he was ultimately laid off, the reason was unrelated to any mental impairments. (AR 36.) Moreover, his treatment records do not indicate significant problems with concentrating during medical appointments, and generally show he had good ability to understand and respond to questions asked. (*See generally* AR Exhibits 1F-17F.) Further, the ALJ noted that at the hearing he was able to concentrate and respond appropriately to questions asked. (AR 36.)

C. Medical Opinions

In June of 2017, neuropsychologist Barbara Rothweiler completed a detailed neuropsychology report after interviewing Baumann, completing neuropsychological

3

testing, and examining available medical records. (AR 584.) In that report, Dr. Rothweiler noted Baumann's "history of subjective concerns regarding memory problems," but concluded:

> Neuropsychological testing reveals no significant pattern of cognitive impairment. Memory is consistently within normal limits to strong. Complex attention and problem solving are within normal limits. General abilities are in the average range. . . . Patient does report marked depression and anxiety as well as pain management difficulties which may contribute to distraction in daily activities.

(AR 585.)

In addition, state agency psychologist Joseph Edwards, Ph.D., completed a Mental Residual Functional Capacity Assessment ("MRFC") form as a part of the agency's Disability Determination Explanation. (AR 116-17.) He rated Baumann's degree of limitation as "moderately limited" in the following, specific functional areas: (1) the ability to maintain attention and concentration for extended periods; (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (3) the ability to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 116-17.) Then, in the "narrative form" section of the form, Dr. Edwards wrote: "Clmt is able to carry out work related instructions, make work related decisions. No fast paced production quotas." (AR 117.)

### D. ALJ Decision

On February 13, 2019, ALJ Debra Meachum issued a decision denying Baumann's application for disability and disability insurance benefits under the five-step sequential

4

analysis. At step one, the ALJ concluded that Baumann had not engaged in substantial gainful activity since his alleged onset date of July 17, 2015, although she noted that Baumann had worked part-time for a Harley-Davidson dealer starting in March of 2018 without considering that work to be a substantial gainful activity. (AR 30-31.) At step two, ALJ Meachum found that Baumann suffered from a number of severe physical and mental impairments. (AR 31-32.)

Then, at step three, the ALJ considered whether Baumann's conditions met or equaled the criteria of a listing-level impairment. (AR 32.) In assessing Baumann's mental impairments at this step, the ALJ concluded that he had a moderate limitation in concentrating, persisting, or maintaining pace. (AR 35.) Overall, however, the ALJ concluded that none of plaintiff's impairments were presumptively disabling, and continued to the next step. (AR 35.)

At step four, the ALJ considered Baumann's residual functional capacity ("RFC"), concluding that he

> [h]as the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), with nonexertional limitations. He should not crawl or climb ladders, ropes, or scaffolds. He can frequently balance and occasionally crouch, kneel, stoop, and climb ramps and stairs. He can occasionally reach overhead bilaterally. He should avoid work around hazards, such as unprotected heights and hazardous moving machinery. He is limited to unskilled work involving simple, routine, and repetitive tasks that do not require fast-paced production line tasks or more than occasional changes in the work setting.

(AR 37.) Given his RFC, the ALJ concluded at step five that Baumann could not perform any of his past relevant work, but based on the vocational expert's testimony, found that

jobs existed in significant numbers in the national economy that he could perform. (AR 43-45.) As a result, ALJ Meachum concluded that Baumann was not disabled within the meaning of the Social Security Act, and denied his application. (AR 46.)

OPINION

Judicial review of a final decision by the Commissioner of Social Security is authorized by 42 U.S.C. § 405(g). An ALJ's findings of fact are considered "conclusive," so long as they are supported by "substantial evidence." § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the Commissioner's findings, the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

I. **Concentration, Persistence, and Pace**

Plaintiff first argues that the ALJ erred by failing to account fully for Baumann's moderate CPP limitations. To understand this argument, some explanation of the Mental Residual Functional Capacity Assessment ("MRFC") form used by Dr. Edwards is necessary. The MRFC form contains four sections: "Heading"; "Section I, Summary

Conclusions"; "Section II, Remarks"; and "Section III, Functional Capacity Assessment and MC/PC signature." POMS 24510.060. Section I in turn contains four subsections: (1) "Understanding and Memory"; (2) "Sustained Concentration and Persistence"; (3) "Social Interaction;" and (4) "Adaptation." *Id.* Further within these Section I subsections are a total of twenty mental function items (e.g., the ability to carry out detailed instructions). *Id.* The author is prompted to rate the claimant's degree of limitation (e.g., moderately limited) as to each of these items. *Id.* In case law, these questions have been referred to as "checkbox," "Section I," or "worksheet" findings. *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015).

In Section III, the author is asked to explain "in narrative format," the scope of claimant's limitations related to each of the four Section I subsections. POMS 24510.060. The MRFC form contains the following explanation of the interplay between the Section I (checkbox) and Section III (narrative) findings:

> The questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion. This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction[,] and adaptation).

(AR 116.)

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Specifically, Seventh Circuit caselaw establishes that a state agency doctors' responses to the "checkbox" questions

7

indicating the claimant's level of limitation as to a particular function constitutes "medical evidence which cannot just be ignored," while acknowledging that these "[w]orksheet observations" are "perhaps less useful to an ALJ than a doctor's narrative RFC assessment." *Varga*, 794 F.3d at 816. As a result, the *Varga* court concluded that "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." *Id.*; *see also Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) ("[T]he ALJ may reasonably rely on the examiner's narrative in Section III, at least where it is not inconsistent with the findings in the Section I worksheet."). Moreover, giving deference to more detailed, narrative assessments not only makes common sense, it is consistent with the language of the form itself, which states as noted above that "the actual mental residual functional capacity assessment is recorded in the *narrative* discussion(s)." (AR 116) (emphasis added).

Here, plaintiff argues that the ALJ erred because Dr. Edwards' "Section I" findings were *not* adequately encapsulated in his narrative, and so any reliance on Dr. Edwards' narrative in crafting Baumann's RFC was flawed. But plaintiff fails to persuasively explain how the narrative was flawed. Plaintiff cites to *Varga*, 794 F.3d 809, and *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019), for support, but both cases are distinguishable.

In *Varga*, the state agency doctor found the claimant to be "moderately limited" in a number of areas related to CPP, yet in the narrative section simply wrote "See EWS," referring to an electronic worksheet that was lost by the agency. 794 F.3d at 811. Thus, the Seventh Circuit merely held that "where, as here, *no* narrative translation exists . . . an ALJ's hypothetical question to the VE must take into account any moderate difficulties in

8

mental functioning found in Section I of the MRFCA form." *Id.* at 816 (emphasis added).

In *DeCamp*, the Section I findings of the two state agency psychologists indicated certain moderate CPP limitations, while their Section III narrative simply included the bottom-line conclusion that the claimant was "capable of withstanding the demands of unskilled as defined by SSA." 916 F.3d at 673. As a result, the Seventh Circuit found that the ALJ improperly "focused her analysis on the doctors' bottom-line conclusion that DeCamp was not precluded from working without giving the vocational expert any basis to evaluate *all* DeCamp's impairments, including those in concentration, persistence, and pace." *Id.* at 676 (emphasis in original).

Here, unlike in *Varga*, Dr. Edwards' narrative was included in the record; and unlike in *DeCamp*, his narrative was not a simple "bottom-line" conclusion that the claimant was capable of work. Instead, Dr. Edwards translated his Section I findings into a specific narrative conclusion regarding Baumann's maximum capacity in a work setting given his CPP-related limitations. Moreover, his Section I findings that Baumann was moderately limited in his (1) ability to maintain attention and concentration for extended periods; (2) ability to perform activities within a schedule; (3) ability to complete a normal workday/week; and (4) perform at a consistent pace were not inconsistent with his narrative conclusion that Baumann could carry out work-related instructions, make work-related decisions, and could not work with fast-paced production quotes.

Thus, this case is more like *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002). There, the state agency psychologist noted in his Section I findings that the claimant had moderate limitations in his ability to (1) perform activities within a schedule; (2) complete

a normal workweek and perform at a consistent pace; and (3) accept instructions and respond appropriately to criticism. *Id.* at 286. The agency psychologist then "went further" and translated these findings into a specific RFC assessment in the Section III narrative, concluding that the claimant could still perform low-stress, repetitive work. *Id.* at 289. The ALJ relied on this narrative in crafting the RFC, which the Seventh Circuit found to be reasonable. *Id. See also Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) ("Lovko's notations in Section I and Section III are not inconsistent. The examiner explained in narrative form in Section III that Capman could adequately manage the stress of unskilled tasks. That Capman is moderately limited in his ability to complete a day or week of work without interruption, as noted in Section I of the form, does not mean that he could not function satisfactorily.").

At oral argument and in his supplemental brief, plaintiff took the position that the state agency psychologist had to specifically address and explain how each of the mental function checkboxes in Section I were translated into his Section III narratives. This argument attempts to clarify what it means for a Section III narrative to adequately "encapsulate" Section I findings. Plaintiff contends that the Programs Operations Manual System and cases from other circuits support this interpretation.

But the court does not agree that the POMS supports plaintiff's position. The portion from the POMS quoted by plaintiff instructs:

> Section III is for recording the formal narrative mental RFC assessment and provides for the medical or psychological consultant (MC/PC) to prepare a narrative statement for each of the subsections (A through D) in section I.

POMS DI 24510.065(A). Plaintiff then represents that this means that, "to be a proper

10

and complete narrative on Section III, the mental consultant must adequately address each of the boxes under Section I. The failure to do so renders the narrative incomplete and requires consideration of the Section I findings." (Pl.'s Supp. Br. (dkt. #23) 7.) But plaintiff incorrectly equates the twenty mental function "boxes" with the four broader subsections. As it relates to the CPP subsection, all the POMS requires is that the author provide a narrative for that subsection, not that he address each mental function checkbox within that subsection.

Indeed, as the Commissioner points out, the POMS generally cuts against plaintiff's position, as it emphasizes that adjudicators can and should rely on the Section III, rather than Section I, findings:

> The purpose of section I . . . is *chiefly to have a worksheet* to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis. *It is the narrative written by the psychiatrist or psychologist in section III . . . that adjudicators are to use as the assessment of RFC.*

POMS DI 25020.010 (emphasis added).

The cases cited by plaintiff provide only weak support. In *Carver v. Colvin*, 600 F. App'x 616 (10th Cir. 2015), the Tenth Circuit explained that "if a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding." *Id.* at 619. In fairness to plaintiff, this statement does appear to suggest that some specific discussion of each of the Section I limitations should be included in the

11

Section III narrative. *Id.* Yet, the court then proceeded find that the agency doctor's Section III narrative that the claimant could "relate to supervisors and peers on a superficial work basis and in a work scenario involving only simple tasks with routine supervision" adequately encapsulated the moderate limitations in the claimant's "ability to accept instructions and respond appropriately to supervisor criticism" that were marked in Section I. *Id.* Thus, it is unclear how much detail the Tenth Circuit demands in order for a Section III narrative to adequately encapsulate Section III findings. The other cases cited by plaintiff either repeat the Tenth Circuit's statement or stand for the general proposition that Section I findings may not simply be ignored and that a Section III narrative may not be relied upon if it is inconsistent with Section I findings. *See Fannin v. Comm'r of the Soc. Sec. Admin.*, No. CIV-18-337-KEW, 2020 WL 1685769, at *3 (Apr. 7, 2020); *Garza v. Saul*, No. CV 19-699 JFR, 2020 WL 5518837, at *13 (D.N.M. Sept. 14, 2020); *York v. Commissioner*, Case No. CIV-19-74-SPS, 2020 WL 5201216 (September 1, 2020); *Bartley v. Astrue*, No. CIV. A. 07-101-GWU, 2008 WL 594468, at *4 (E.D. Ky. Feb. 29, 2008). Thus, the court here concludes a Section III narrative need not specifically name and discuss each Section I finding in order to adequately "encapsulate" those findings.

Regardless, plaintiff's claim fails for a separate reason: the overall medical record does not support greater CPP limitations than those found by the ALJ. An RFC need only incorporate those limitations supported by the relevant evidence in the case record. *See* 20 C.F.R. § 416.945. In *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019), the claimant argued that the ALJ's RFC limiting him to "routine tasks and limited interactions with others" did not adequately account for the moderate limitations in CPP the ALJ found at step three of

the functional analysis. *Id.* at 497-98. The Seventh Circuit, however, upheld the ALJ's decision, explaining that because the claimant "did not testify about restrictions in his capabilities related to concentration, persistence, or pace deficits, and the medical record does not support any, there are no evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Id.* at 498.

Here, other than the Section I findings in Dr. Edwards' MRFC form, the only evidence plaintiff cites to support a greater CPP limitation than in the RFC is Dr. Rothweil's note that Baumann "does report marked depression and anxiety as well as pain management difficulties which may contribute to distraction in daily activities." (Pl.'s Br. (dkt. #13) 14 (citing AR at 586).) In the same note, however, Dr. Rothweil concluded that Baumann's memory and complex attention and problem solving were within normal limits. (AR at 585.) And other evidence -- such as Baumann's function report and his behavior during medical appointments -- also supports finding generally normal CPP abilities. Thus, again, the limitations incorporated into the ALJ's RFC findings adequately address Baumann's CPP limitations. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform.").

Relatedly, plaintiff argues the ALJ erred in applying Dr. Edwards' narrative findings because his opinion was not supported by the record. (*See* Pl.'s Supp. Br. (dkt. #23) 2-3.) But Dr. Edwards' Section I findings are no more supported than his narrative, and plaintiff

13

therefore cannot logically argue that the ALJ should have relied on the former findings but not the latter.  And anyway, if plaintiff is indeed correct that the ALJ should not have relied on Dr. Edwards' opinion at all because it was not supported by the record, then that error is harmless because as noted above the rest of the record does not support any greater CPP limitation.

## II. Past Work

Plaintiff next argues that Baumann's past work at Harley-Davidson should not have been relied upon by the ALJ because it was in fact "accommodated" work.  (Pl.'s Br. (dkt. #13) 19.)  Unfortunately for plaintiff, there are numerous problems with this argument as well.

*First*, plaintiff incorrectly asserts that accommodated work cannot be considered substantial gainful activity, and an ALJ may not deprive a claimant of benefits because of his past performance of accommodated work.  However, ALJ Meachum never found Baumann's accommodated work at Harley-Davidson to be substantial gainful activity. Indeed, she specifically found that Baumann's *post*-2015 work activity -- including part-time work at Harley-Davidson -- did *not* rise to the level of substantial gainful activity.  (*See* AR at 30-31.)  She also did not include this accommodated work at Harley-Davidson in assessing his ability to perform past relevant work at step five.  (AR at 44-45.)

*Second*, plaintiff suggests that the ALJ was wholly precluded from considering Baumann's accommodated job as evidence of his ability to work at step four.  (Pl.'s Br. (dkt. #13) 23.)  Again, however, plaintiff cites no legal or administrative support for this proposition.  If anything, according to the regulations, "[t]he RFC assessment must be

14

based on *all* of the relevant evidence in the case record, such as . . . [e]vidence from attempts to work." SSR 96-8p (emphasis in original).

*Third*, as plaintiff emphasizes, "[a] finding that claimant cannot sustain full-time work would require a conclusion that she is disabled" and suggests that the ALJ should have considered plaintiff's inability to work full-time and without accommodations at Harley-Davidson "as evidence favoring a finding of disability." (*Id.*) However, Baumann's inability to work full-time and without accommodations at Harley-Davidson does *not* mean that he would be unable to perform *any* full-time, non-accommodated job in the national economy. Instead, the regulations explain that if an individual is unable to perform past work, the ALJ is to consider the claimant's ability to adjust to "other work." 20 C.F.R. § 404.1560(c). If the claimant can perform "[a]ny other work" that "exists in significant numbers in the national economy," then he is not disabled under § 404.1560(c).

Thus, the ALJ's treatment of Baumann's past job at Harley-Davidson was proper, and the court will not remand the case on this basis.

### III. Activities of Daily Living

Plaintiff further contends that the ALJ improperly assessed Baumann's activities of daily living. "In determining whether you are disabled," the regulations specifically contemplate consideration of "all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work." 20 C.F.R. § 404.1529(a). In addition, SSR 96-8p confirms that "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record, such as . . . [r]eports of daily

15

activities." (emphasis in original).

Recognizing this, the Seventh Circuit has explained that "it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability," but still "urged caution in equating these activities with the challenges of daily employment in a competitive environment." *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *see also Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (an ALJ may not simply "equat[e] the activities of daily living with those of a full-time job"). This caution arises out of "critical differences between activities of daily living and activities in a full-time job." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). For example, "a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Id.*

In the end, there is *no* indication that the ALJ in this case improperly equated Baumann's activities of daily living with the activities required in a full time job. Instead, as with plaintiff's past work, the ALJ explained that "consideration of the claimant's day-to-day activities does shed some light on his actual functioning, which is essentially consistent with his residual functional capacity," although also recognizing that such activities were "not dispositive when rendering a disability decision." (AR at 39.) Not only is this approach consistent with the regulations and case law, plaintiff fails to explain which, if any, of the ALJ's RFC findings were flawed because of her allegedly improper analysis. Accordingly, the court finds that the ALJ also did *not* err in her consideration of Baumann's activities of daily living.

**IV. Subjective Reports of Pain**

Finally, plaintiff argues that the ALJ failed to account for Baumann's reported pain adequately in assessing his ability to sustain full-time work. Under SSR 16-3p, an ALJ must follow a two-step process in evaluating a claimant's subjective reports of pain: (1) the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms"; and (2) the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.*

Plaintiff represents that "the ALJ made no attempt to assess Baumann's reported pain or to comply with the Commissioner's own policy interpretation of his regulations." (Pl.'s Br. (dkt. #13) 28.) But, again, plaintiff is simply wrong. The ALJ actually wrote that she "considered the claimant's pain complaints, finding that he certainly has severe impairments and has undergone procedures that would cause pain, but that the evidence, both medical and nonmedical, does not establish that this would preclude the limited range of work activities assessed in this decision." (AR at 42.) The ALJ then proceeded to discuss the evidence regarding Baumann's reports of pain and other symptoms in greater detail (AR at 42-43), ultimately concluding that: "[a]fter careful consideration of the evidence, . . . the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this

17

decision." (AR at 43.)

Plaintiff similarly accuses the ALJ of "cherry-picking" the record by citing only evidence that supports her conclusion. To support this argument, plaintiff points to notes from one of plaintiff's physicians indicating that in March and September of 2018, Baumann continued to have joint pain. (Pl.'s Br. (dkt. #13) 29 (citing AR at 1113-14, 1120, 1124).) An ALJ "need not discuss every piece of evidence in the record"; nor may an ALJ "ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

However, the ALJ discussed other records from this physician noting Baumann's pain, and ALJ Meachum also discussed other evidence of his joint pain. (*See* AR at 42-43.) Thus, the ALJ did not ignore an entire line of evidence, nor err by failing to discuss specific records identified by plaintiff.

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying plaintiff Glen Michael Baumann's application for disability insurance benefits is AFFIRMED.

Entered this 9th day of December, 2020.

BY THE COURT:
/s/

_____
WILLIAM M. CONLEY
District Judge